Joseph J. KINDLER,

v.

Martin HORN, Commissioner, Pennsylvania Department of Corrections; Donald T. Vaughn Superintendent of the State Correctional Institution at Graterford, and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview.

No. CIV.A.99–CV–0161.

United States District Court, E.D. Pennsylvania.

Sept. 24, 2003.

Kathy Swedlow, Defender Association of Phila., Federal Court Division, Matthew C. Lawry, Federal Defenders, Robert Brett Dunham, Defender Assoc. of Phila., Stephen L. Marley, Defender Assoc of Phila., Federal Court Division, Philadelphia, PA, for Joseph J. Kindler, Petitioner.

David Curtis Glebe, Office of the District Attorney, Donna G. Zucker, Thomas W. Dolgenos, District Attorney's Office, Philadelphia, PA, for Martin Horn, Pennsylvania Department of Corrections, Donald T. Vaughn, of the State Correctional Institution at Graterford and, Joseph P. Mazurkiewicz, of the State Correctional Institution at Rockview, Respondents.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

This case has been brought before this Court by Petition of Joseph J. Kindler for Writ of Habeas Corpus. For the reasons which follow, the petition shall be partially granted and leave given to the Commonwealth to conduct a new sentencing hearing.

### History of the Case

This petition seeks relief on behalf of the petitioner from the sentence of death which was formally imposed upon him on October 2, 1991. That sentence was the result of Petitioner's November 15, 1983 conviction by a Philadelphia County Court

of Common Pleas jury of the first degree murder, kidnapping and criminal conspiracy to murder 22–year–old David Bernstein on July 25, 1982.

Although Petitioner filed post-verdict motions, he escaped from custody on September 19, 1984, before those motions had been decided. The Commonwealth of Pennsylvania filed a petition to dismiss the post-verdict motions because Mr. Kindler was a fugitive from justice and that petition was granted, after hearing, on the grounds that Mr. Kindler's voluntary removal of himself from the court's jurisdiction operated as a waiver of whatever rights he may have had to have his post-verdict motions considered.

Petitioner remained a fugitive until April 26, 1985 when he was arrested in Quebec, Canada on criminal and immigration charges. Extradition was requested and granted by the Canadian Minister of Justice on January 17, 1986 but Petitioner sought to have that decision reviewed in the Canadian Courts. While that review was pending, Petitioner again escaped from the prison in Montreal, Canada where he was being held and remained at large for nearly another two years until he was again spotted and arrested in St. John, New Brunswick, following the broadcast of information about him on the television show, "America's Most Wanted." The Supreme Court of Canada thereafter affirmed the decision of the Minister of Justice on September 26, 1991 and Petitioner was finally returned to Philadelphia later that day.[1] As noted, Petitioner's formal

---

1. As summarized by the Pennsylvania Supreme Court's opinions disposing of Petitioner's direct appeal of his conviction and sentence and the appeal of the denial of his petition under the Pennsylvania Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et seq.*, the evidence at trial supported the following recitation of the history of Mr. Kindler's crimes:

> On April 2, 1982, the Sound Odyssey store in Lower Moreland Township, Bucks County, was burglarized. A Lower Moreland Township patrol officer noticed a vehicle with its lights out pulling out of the cul-de-sac behind the Sound Odyssey at a high rate of speed and further noticed three persons inside the vehicle. Police were able to stop this vehicle, but the driver fled and was not apprehended. The two remaining passengers of this vehicle, Scott Shaw (Shaw), a sixteen-year-old juvenile and the victim, David Bernstein (Bernstein) were detained and arrested. While in police custody, Bernstein identified Appellant as the driver of the vehicle and further told the police that the burglary was Appellant's idea and that he would be willing to testify against Appellant and Shaw. This information was then conveyed to the Philadelphia Police since Appellant lived in Philadelphia, and the police secured a warrant for Appellant's arrest.
> The police executed the warrant by going to Appellant's home and, after a struggle,

> handed Appellant a copy of the warrant which clearly named Bernstein as the informant. Appellant was arrested and charged with the burglary of the Sound Odyssey, along with other theft-related offenses at other locations in three counties. Following a preliminary hearing, Appellant was held for court in Montgomery County for the Sound Odyssey theft and Appellant filed a motion to quash the charges against him, claiming that the evidence presented at the preliminary hearing was insufficient. A hearing was scheduled on this motion for July 23, 1982, and the Montgomery County District Attorney's office obtained an order granting Bernstein immunity so that he could testify at this hearing. Bernstein's attorney informed Appellant's attorney that his client had been immunized for the July 23, 1982 hearing and that, if called to the stand, he would testify.
> At the July 23, 1982 hearing, Bernstein appeared pursuant to the immunity order but Appellant did not appear, nor did his counsel and the motion to quash was dismissed with prejudice. Trial was set for August 17, 1982, and Bernstein, fearing that Appellant might try to prevent him from testifying, planned to move back home with his parents on July 25, 1983, according to testimony provided by the victim's mother.

Appellant complained to Shaw and Shaw's girlfriend, Michelle Raifer (Raifer) that he had to get rid of Bernstein because he would testify against him and discussed several plans with them for eliminating Bernstein, including drowning him in the Delaware River. On July 24, 1982, Appellant met with Raifer, who arranged to get her mother's car and to meet Appellant and Shaw. That evening the three met and drove the car to within a block of Bernstein's apartment. Raifer called Bernstein and established that he was home and Appellant instructed Raifer to leave and return to the apartment later in the evening with the car. At this time, Appellant placed an inner tube and flippers into the trunk of the automobile.

Appellant and Shaw then hid in a field near Bernstein's apartment to watch the door. Raifer returned between 2:30 and 2:45 a.m. on July 25, 1982 and Appellant, holding a black baseball bat, met her outside the apartment. Appellant told Raifer to ring the doorbell and to get Bernstein to come outside while Appellant, armed with his baseball bat, hid in the alleyway right next to the door to the apartment building.

Raifer did as she was instructed. Bernstein opened the door and had a conversation with Raifer and after some time Appellant pulled the door fully open, dragging out Bernstein and began beating him over the head with the baseball bat approximately 20 times. Shaw also appeared on the scene and Appellant instructed him to hit Bernstein with an electric prod, which he did five times in the ribs. At this point Bernstein was rendered immobile and Appellant and Shaw dragged their victim to Raifer's waiting automobile, leaving a thirty-foot long trail of blood stains, and threw him into the trunk. Appellant and Shaw got into the car and drove with Bernstein still moaning in the trunk, for seven miles to a point on the River Road on the Delaware River. Appellant and Shaw then took Bernstein out of the trunk and as they began to throw Bernstein's body into the river, Appellant told Raifer to drive back to the main road and wait for them. Raifer drove off, but returned soon to find Appellant and Shaw emerging from the river. All three reentered the automobile and Appellant explained that Bernstein's body wouldn't sink so they had to fill his lungs with water and tie a cinder block around his neck to weigh the body down.

On the way back to Philadelphia, Raifer was instructed to stop the car so that Appellant could throw away the baseball bat, clothes and shoes he and Shaw had used during the murder. These items were tossed into various sewer inlets along Grant Street. The police later recovered the blood-stained baseball bat, shirt, pants and shoes that Appellant wore and Shaw's t-shirt and shoes. When the three returned to Appellant's home, they tried to wash the blood stains out of the trunk, using a Styrofoam ice chest and threw it and the trunk mat of Raifer's automobile into another sewer inlet. The pieces of broken ice chest and the trunk mat, the swimming suits that Appellant and Shaw were wearing, the inner tube, electric prod and a camouflage shirt that Appellant had worn were all later recovered from this sewer inlet by the police.

There was also testimony provided by one of Bernstein's neighbors (Craig Sattinsky) that he heard Bernstein being beaten and a car driving away and that when he came outside to investigate he saw Bernstein's apartment door open with Bernstein's girlfriend sitting there. By this time the girl was hysterical and corroborated Satinsky's suspicion that it was Bernstein that he heard being beaten and dragged off in an automobile. They both went out to the street and saw the trail of blood and Bernstein's girlfriend, Lisa Rothbarth, called the police giving them information which led them to look for Raifer's car. Within a few hours, the police intercepted Raifer at her home and seized the blood-soaked car. Raifer eventually confessed, identified Shaw and Appellant as Bernstein's murderers, and led the police to the various sewer inlets, where as already indicated, they retrieved the various items used in connection with the murder.

On July 26, 1982, at around 7:30 p.m., Bernstein's body surfaced in the Delaware River near River Road. The body had a cinder block tied to its neck. Multiple blows to the head were observed which were later shown by a medical examination to be consistent with blows from a bat and bruises were seen to the chest consistent with being made by the electric prod. The forensic medical examination also revealed that, prior to expiring, Bernstein ingested water and silt. The cause of death was identified as drowning and massive head injuries.

sentencing took place on October 2, 1991, at which time he was sentenced to death on the murder conviction in addition to a consecutive ten to twenty years' imprisonment on the kidnaping conviction and a concurrent five to ten year sentence for criminal conspiracy. Petitioner then appealed to the Pennsylvania Supreme Court, which found: (1) that the trial court did not abuse its discretion in dismissing his post-trial motions and allegations of ineffective assistance of counsel as a response to his escape from custody and flight; (2) that sufficient evidence had been presented at trial to support the first-degree murder conviction and a finding of at least one aggravating circumstance; (3) that the death sentence was not the product of passion, prejudice or any other arbitrary factor; and (4) that the sentence was not excessive or disproportionate to those imposed in similar cases. *Commonwealth v. Kindler,* 536 Pa. 228, 639 A.2d 1 (1994). Although Mr. Kindler subsequently filed a petition for a writ of certiorari to the United States Supreme Court, that petition was likewise *denied on October 11, 1994.*

On January 11, 1996, Petitioner sought relief by filing a petition under the Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et seq.* ("PCRA"). In that petition, Mr. Kindler raised several issues including those previously raised on direct appeal to the Pennsylvania Supreme Court as well as several claims which essentially challenged the effectiveness of both his trial and his post-trial counsel. The Philadelphia County Court of Common Pleas again found that Petitioner had waived his right to raise these arguments when he escaped and fled the jurisdiction. It therefore denied and dismissed the PCRA application

without a hearing on August 15, 1996 and Petitioner appealed to the Pennsylvania Supreme Court, which subsequently affirmed the decision of the Court of Common Pleas on December 11, 1998.[2]

By way of the petition for writ of habeas corpus which he has filed in this Court, Petitioner asks that this Court vacate his death sentence on the following grounds:

1. That he was sentenced by a jury that believed it could not return a verdict at the penalty phase without agreeing unanimously both as to individual mitigating circumstances and as to the proper ultimate penalty in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

2. That the "proportionality review" performed by the Pennsylvania Supreme Court did not provide him with the meaningful appellate review mandated by the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 Pa.C.S. § 9711(H)(3)(III).

3. That his counsel at the penalty phase of his trial was ineffective in that he failed to develop and present available mitigating evidence on his behalf in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

4. That he was deprived of the individualized sentencing determination to which he was entitled under the Eighth and Fourteenth Amendments to the U.S. Constitution given that his penalty phase proceedings were conducted jointly with his co-defendant, Scott Shaw.

5. That prosecutorial misconduct during the guilt and penalty phase of the

---

*See: Commonwealth v. Kindler,* 536 Pa. 228, 639 A.2d 1, 5 (1994) and *Commonwealth v. Kindler,* 554 Pa. 513, 514–518, 722 A.2d 143, 144–145 (1998).

**2.** The Supreme Court further denied Petitioner's request for reargument on March 15, 1999. *See: Commonwealth v. Kindler,* 554 Pa. 513, 722 A.2d 143 (1998).

trial violated his rights to Due Process of Law.

6. That the jury failed to give effect to clear and uncontroverted evidence of mitigation in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

7. That the trial court gave a defective preponderance of the evidence instruction in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

8. That the sentencing jury was never instructed that if sentenced to life imprisonment, he would be statutorily ineligible for parole, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

In addition, the Petition for Writ of Habeas Corpus seeks to have Mr. Kindler's conviction overturned because the notes of testimony from the severance hearing and from two days of the jury's voir dire were never transcribed and because of the cumulative prejudicial effect of all of the errors in this case. As a result of these failures, Petitioner contends that he was denied his right to meaningful appeal of his convictions and death sentence. Underscoring *all* of Petitioner's arguments is the assertion that to the extent that they failed to raise these arguments earlier, trial counsel and prior appellate counsel were ineffective.

Respondents at the outset assert that the petition for habeas relief must be dismissed as untimely filed and because Petitioner failed to first fairly present the claims which he seeks to raise here to the state courts. Accordingly, Respondents contend, Mr. Kindler has failed to procedurally exhaust his federal claims or they are procedurally defaulted and now unreviewable. Alternatively, Respondents submit that all of Petitioner's claims are merritless. We shall first consider whether this petition has been timely filed.

### *Discussion*

A. **Timeliness of Filing of Petition for Writ of Habeas Corpus.**

In this case, the petitioner filed his habeas petition on March 13, 2000, following this court's granting of his motion for appointment of counsel, stay of execution and motion to proceed *in forma pauperis* on February 9, 1999. Insofar as the Pennsylvania Supreme Court denied Mr. Kindler's PCRA petition on December 11, 1998, Respondents aver that the petition for habeas corpus must be stricken as out-of-time.

The provisions governing federal habeas corpus proceedings were extensively overhauled on April 24, 1996, when the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") took effect. Under § 101 of that Act, 28 U.S.C. § 2244(d):

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Although the Act did not specifically state as much, the Third Circuit has implied from the statute a one-year grace period for those petitioners whose convictions became final before the effective date of AEDPA such that those state prisoners had until April 23, 1997 to file habeas corpus petitions in the district courts. *Nara v. Frank*, 264 F.3d 310, 314–315 (3d Cir.2001); *Burns v. Morton*, 134 F.3d 109, 111 (3d Cir.1998).

Here, the Pennsylvania Supreme Court affirmed the petitioner's judgment of sentence on February 9, 1994 and denied his motion for re-argument on April 8, 1994. The U.S. Supreme Court denied certiorari on October 11, 1994. It is thus clear that Petitioner's conviction became final before AEDPA took effect.

Thereafter on January 11, 1996, Petitioner filed a petition for relief under Pennsylvania's Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et. seq.* The Philadelphia County Court of Common Pleas dismissed this petition without a hearing on April 15, 1996 and Petitioner then appealed to the Pennsylvania Supreme Court, which affirmed on December 11, 1998.[3] Petitioner moved for reargument, which was denied on March 15, 1999. It thus appears that Mr. Kindler's PCRA petition was pending when AEDPA took effect on

April 24, 1996 and that the one-year statute of limitations was tolled at least until December 11, 1998. The issue with which we are faced here is whether this statutory period was further tolled while the petitioner's motion for reargument was pending before the Pennsylvania Supreme Court.

As noted under § 2254(d)(2), ordinarily "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation.." An application is considered to be "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. *Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 364, 148 L.Ed.2d 213 (2000). To properly apply this statute as a matter of federal law, we must look to state law governing when a petition for collateral relief is properly filed and the AEDPA requires that state law be interpreted as it would be in a diversity case by deferring to the state's highest court when it rules on an issue. *Fahy v. Horn*, 240 F.3d 239, 243–244 (3d Cir.2001). This is because § 2244(d)(2)'s "tolling rule is designed to protect the principles of comity, finality and federalism by promoting the exhaustion of state remedies while respecting the interest in the finality of state court judgments." *Brown v. Shannon*, 322 F.3d 768, 776 (3d Cir.2003), quoting *Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 2139, 153 L.Ed.2d 260 (2002). Permitting petitions not recognized under state law and improperly filed as a matter of state law to toll the limitations period would not seem

---

3. The Pennsylvania Supreme Court has exclusive jurisdiction over appeals from final orders issued by the Courts of Common Pleas in those cases in which a sentence of death has been imposed. *See:* 42 Pa.C.S. §§ 722, 9711(h).

to promote exhaustion in the manner contemplated by the AEDPA. *Id.*

■ The Third Circuit has further noted that a flexible approach is to be employed in determining whether a motion is properly filed under § 2244(d)(2), given that this section covers various forms of state review, including motions that do not fall directly under the PCRA but are nonetheless related to collateral review. *Nara v. Frank,* 264 F.3d 310, 315 (3d Cir.2001); *Jones v. Morton,* 195 F.3d 153, 159 (3d Cir.1999); *Douglas v. Beard,* Civ. A. No. 00–4935, 2002 WL 550474, *1, 2002 U.S. Dist. LEXIS 6406, *8 (E.D.Pa. April 12, 2002). Of threshold importance is that the application be for a *state* remedy; indeed, the law is now clear that the limitations period will not be tolled during the pendency of a state prisoner's petition for writ of certiorari to the U.S. Supreme Court or the pendency of a petition for writ of habeas corpus in the federal courts. *See, Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Miller v. Dragovich,* 311 F.3d 574 (3d Cir.2002); *Stokes v. The District Attorney of Philadelphia County,* 247 F.3d 539 (3d Cir. 2001). It *will* be tolled, however, during the time for seeking discretionary review in the state court system, so long as timely and properly filed. *See: Carey v. Saffold, supra; Phillips v. Vaughn,* 55 Fed.Appx. 100, 101 (3d Cir.2003); *Swartz v. Meyers,*

204 F.3d 417, 431–422 (3d Cir.2000); *Baker v. Horn,* 210 F.Supp.2d 592, 620 (E.D.Pa.2002).

■ In this case, the record reflects that the Pennsylvania Supreme Court affirmed the dismissal of Petitioner's PCRA application on December 11, 1998 and that Petitioner then moved for reargument. While not a matter of right, applications for reargument are clearly permitted under the Pennsylvania Rules of Appellate Procedure, and must be filed within fourteen days after entry of the judgment or order involved and in conformity with the other requirements of Pa.R.A.P. Nos. 2541–2544. The parties here do not dispute that Mr. Kindler's application for reargument was timely and properly filed and it remained pending until the Pennsylvania Supreme Court denied it on March 15, 1999. We thus conclude that while discretionary, the petitioner's application for reargument did toll the statutory period for the filing of his habeas corpus petition in this court. Accordingly, Petitioner had until March 14, 2000 to file his habeas corpus petition under the AEDPA and his March 13, 2000 filing was therefore timely.[4]

**B. Exhaustion and/or Procedural Default of Petitioner's Claims.**

Respondents next assert that the claims which Petitioner now advances are not re-

4. Petitioner alternatively argues that his petition for habeas relief should be deemed timely filed because this action was actually commenced by his filing a motion for appointment of counsel and stay of execution and that the one-year statute of limitations should be equitably tolled due to the Commonwealth's having filed an appeal from this Court's order granting the motion for stay of execution. While we do not expressly reach these issues because of our finding regarding statutory tolling, we would direct Petitioner's attention to the U.S. Supreme Court's very recent decision in *Woodford v. Garceau,* 538

U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) in which the Court rejected the argument that a habeas action is commenced by the filing of a motion for appointment of counsel and held that a case does not become "pending" within the meaning of *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding that the amendments made under AEDPA to chapter 153 of Title 28, U.S.C. do not apply to cases "pending" in federal court on AEDPA's effective date) until an actual application for habeas corpus relief is filed in the federal court.

viewable by this Court as he failed, by escaping from custody and fleeing the Commonwealth of Pennsylvania, to give the state courts the opportunity to address and possibly correct the alleged constitutional errors in his conviction and sentencing. Consequently, those claims have been procedurally defaulted. Petitioner rejoins that all of his claims have been exhausted in that they or their substantial equivalents *were* presented to the Pennsylvania state courts for adjudication and by virtue of the requirement that the Pennsylvania Supreme Court review the entire record in death penalty cases to ensure that the penalty of death was not imposed as the result of passion, prejudice or any other arbitrary factor. In addition, petitioner contends, the procedural default rules applied by the Pennsylvania state courts were not adequate to bar federal habeas merits review as of 1984, when he escaped from the Philadelphia Detention Center.

■ It has, of course, long been the settled rule that before a federal court may reach the merits of a claim in a timely filed § 2254 petition, each claim must first have been exhausted in state court. *See,* 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Baker v. Horn,* 210 F.Supp.2d 592, 625 (E.D.Pa. 2002). The exhaustion requirement ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights. *Caswell v. Ryan,* 953 F.2d 853, 857 (3d Cir.1992), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992), citing *Rose v. Lundy,*

455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

■ To satisfy the exhaustion requirement, a petitioner must demonstrate that he "fairly presented" every claim in the federal petition to each level of the state courts, including the highest state court in which the petitioner was entitled to review. *Whitney v. Horn,* 280 F.3d 240, 250 (3d Cir.2002); *Baker,* 210 F.Supp.2d at 625, citing *O'Sullivan v. Boerckel,* 526 U.S. 838, 845–848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). To "fairly present" a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted. *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999). The state courts, however, need not reach the merits of a claim for it to be properly exhausted; exhaustion requires only that a federal habeas petitioner afford the state courts the *opportunity* to consider a claim on its merits. *Lambert v. Blackwell,* Civ. A. No. 01–CV– 2511, 2003 WL 1718511 at *23 (E.D.Pa. April 1, 2003) and *Baker v. Horn, supra,* both citing *Castille v. Peoples,* 489 U.S. 346, 350–51, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989).

■ However, if a state's procedural rules bar a petitioner from seeking further relief in the state courts, the exhaustion requirement is satisfied because there is an absence of available State corrective process.[5] *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000), citing *McCandless,* 172 F.3d at 260. 28 U.S.C. § 2254(b)(1)(B)(i). This is otherwise known as "procedural default" and it is said to occur when a prisoner's federal claim is barred from

---

5. Or, as sometimes occurs, it would be futile to require the presentation of the claims to the state court and hence the exhaustion requirement is excused and the claims would be

subject to the doctrine of procedural default. *See, Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir.2001).

consideration in the state courts by an "independent and adequate" state procedural rule. *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir.2002). Even so, this does not mean that a federal court may, without more, proceed to the merits. Instead, claims deemed exhausted because of a state procedural bar may not be considered by the federal courts unless the petitioner establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the procedural default. *Id.*

"Cause" sufficient to excuse procedural default requires a showing that some objective factor, external to the defense, prevented compliance with state procedural rules. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). "Actual prejudice" occurs only if an error caused the "actual and substantial disadvantage" of the petitioner. *Riley v. Myers*, Civ. A. No. 01–6958, 2002 WL 31845865, *6, 2002 U.S. Dist. LEXIS 24404, *20 (E.D.Pa. Dec.18, 2002), quoting *U.S. v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The burden of proof is on the petitioner to establish both cause for the default and resulting prejudice. *Id.*, citing *Teague v. Lane*, 489 U.S. 288, 298, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

Alternatively, if the petitioner establishes that the state procedural rule was not independent or adequate, the federal court may proceed to consider the merits of his claim. *See Generally: Gray v. Netherland*, 518 U.S. 152, 162, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996); *Harris v. Reed*, 489 U.S. 255, 262–263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A state rule provides an independent and adequate basis for precluding federal review of a state prisoner's habeas claims only if: (1) the state procedural rule speaks in unmistak-able terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions. *Doctor v. Walters*, 96 F.3d 675, 683–684 (3d Cir.1996); *Jones v. Lavan*, Civ. A. No. 02–2359, 2002 WL 31761423, *1, 2002 U.S. Dist. LEXIS 23715, *5 (E.D.Pa. Dec.9, 2002). A state procedural ground is not "adequate" unless the procedural rule is "strictly or regularly followed." *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Doctor v. Walters, supra*. *See Also: Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991). Nevertheless, the Supreme Court has held that if a state supreme court faithfully has applied a procedural rule in "the vast majority" of cases, its willingness in a few cases to overlook the rule and address a claim on the merits does not mean that it does not apply the procedural rule regularly or consistently. *Banks v. Horn*, 126 F.3d 206, 211 (3d Cir.1997), citing *Dugger v. Adams*, 489 U.S. 401, 410, n. 6, 109 S.Ct. 1211, 1217, n. 6, 103 L.Ed.2d 435 (1989). Accordingly, an occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate to procedurally bar advancing a habeas corpus claim in a district court. *Id. See Also: Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir.1999). Federal courts should generally determine questions of procedural default according to the habeas waiver law in effect at the time of the asserted waiver. *Doctor v. Walters*, 96 F.3d at 684, citing *Reynolds v. Ellingsworth*, 843 F.2d 712, 722 (3d Cir.1988). *See Also: Jermyn v. Horn*, 266 F.3d 257, 278 (3d Cir.2001); *Banks v. Horn*, 126 F.3d at 212–213; *Peterkin v. Horn*, 176 F.Supp.2d 342, 353–354 (E.D.Pa.2001).

■ In this case, the record reflects that the trial court dismissed Mr. Kindler's post-trial motions by reason of his escape from custody and his then-current status as a fugitive from justice. Although it is not absolutely clear from the record, it appears that the trial judge based this decision on the "fugitive forfeiture rule" as articulated in *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346 (1984). The Pennsylvania Supreme Court affirmed the trial court decision, concluding "that the action taken in dismissing the post-verdict motions was a reasonable response to Appellant's 'flouting' of the authority of the court..." *Commonwealth v. Kindler*, 536 Pa. 228, 639 A.2d 1, 3 (1994). In so holding, the Pennsylvania Supreme Court noted that it was charged with deciding whether the fugitive forfeiture rule, which was generally applicable to defendants who fled from justice during the *appellate* process, should likewise be applied to the petitioner, who fled while his *post-trial motions* were pending.

Subsequent to the Pennsylvania Supreme Court's decision affirming his conviction and sentence and the denial of his application for writ of certiorari to the U.S. Supreme Court, Mr. Kindler filed a petition under the Pennsylvania Post–Conviction Relief Act, 42 Pa.C.S. § 9541, *et seq.*, but the Philadelphia County Court of Common Pleas dismissed the petition for the same reason that it dismissed his post-verdict motions. The Pennsylvania Supreme Court affirmed this decision as well, noting that to be eligible for relief under the PCRA, the issues raised in the petition could not have been previously litigated. Reasoning that since Mr. Kindler had previously challenged the trial court's dismissal of his post-verdict motions because of

his flight, the Supreme Court concluded that he could not obtain relief on this basis under the PCRA.

In considering the question of whether, as of September 20, 1984,[6] the fugitive forfeiture rule was one which the Pennsylvania courts have strictly and regularly followed and therefore whether it is independent and adequate, we are guided by the holding of the U.S. Court of Appeals for the Third Circuit in *Doctor v. Walters*, 96 F.3d 675 (3d Cir.1996). In that case, the defendant escaped from custody during the luncheon recess of his criminal bench trial for aggravated assault and remained at large for five years. He was found guilty in absentia and, upon his return to custody, sought to appeal his conviction and sentence. The Pennsylvania Superior Court quashed the appeal pursuant to the fugitive forfeiture rule as articulated in Pa.R.A.P.1972(6), the Pennsylvania Supreme Court affirmed and the U.S. Supreme Court denied certiorari. In evaluating whether the fugitive forfeiture rule was firmly established and regularly applied at the time that Doctor escaped in 1986, the Third Circuit conducted an exhaustive analysis of Pennsylvania Superior and Supreme Court cases applying the rule and found that as of that time,

"Pennsylvania's fugitive forfeiture rule can be described as follows: if the defendant is returned to custody while his appeal is pending, an appellate court has the discretion to hear the appeal, but if the defendant is returned to custody after the appeal is dismissed, an appellate court lacks the discretion to reinstate and hear the appeal .... (citations and parenthetical references omitted). It is clear from these decisions, which reflect the state of the law at the time of

**6.** This is the date on which the petitioner initially escaped from the Philadelphia Detention Center.

petitioner's escape, that Pennsylvania law afforded appellate courts different degrees of discretion depending on the posture of the appeal upon a former fugitive's return to custody. Pennsylvania law had never confronted the situation that arises in the instant case where petitioner's flight had ended and custody had been restored before the appellate process was ever initiated. Thus, it was not 'firmly established' that Pennsylvania courts lacked the discretion to hear an appeal first filed after custody had been restored. Under the *[Commonwealth v.] Galloway*[, 333 A.2d 741, 460 Pa. 309 (1975)] rationale, a court would have the discretion to hear an appeal filed by such a defendant because the defendant would be in custody during the entire pendency of his appeal and subject to the enforcement of any order entered as a result thereof. Furthermore, as the Superior Court noted in *Jones*, 564 A.2d at 985–86, it was unclear, until the Pennsylvania Supreme Court's decision in *Commonwealth v. Luckenbaugh*, 520 Pa. 75, 550 A.2d 1317 (1988), whether the *Passaro* forfeiture analysis even applied to a defendant who escaped and returned to custody during the pendency of his appeal. Therefore, the state courts in this case did not rely on an 'adequate' procedural rule to deny petitioner a review of his appeal on the merits."

*Doctor*, 96 F.3d at 685–686. *See Also: Clark v. Commonwealth of Pennsylvania*, 892 F.2d 1142, 1149 (3d Cir.1989). Given that Mr. Kindler also escaped and was returned to custody prior to the initiation of the appellate process (albeit during the pendency of his post-trial motions), we can find no reason to depart from the analysis

of the *Doctor* court. Accordingly, we find that the fugitive forfeiture rule as applied in the instant case does not provide an independent and adequate basis to preclude federal review of Petitioner's habeas claims and we shall therefore consider these claims.[7]

**C. Applicable Standards to Habeas Corpus Petitions.**

The principles for determining whether or not to grant a petition for a writ of habeas corpus to a state prisoner are stated at 28 U.S.C. § 2254(d):

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Furthermore, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Supreme Court has noted that "clearly established Federal law" un-

---

**7.** We therefore do not reach the issues of whether there existed cause for the petitioner's default and resultant prejudice or whether the refusal to consider the merits of Mr. Kindler's claims would result in a miscarriage of justice.

der § 2254(d)(1) is the governing legal principle or principles set forth by it (the Supreme Court) at the time the state court renders its decision. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003), citing *Williams v. Taylor*, 529 U.S. 362, 405, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). A state court's decision is "contrary to clearly established precedent" if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from that precedent. *Lockyer*, 123 S.Ct. at 1173; *Williams*, 529 U.S. at 405–406, 120 S.Ct. at 1523. Avoiding these pitfalls does not require citation of Supreme Court precedent; indeed, it does not even require awareness of it, so long as neither the reasoning nor the result of the state court decision contradicts it. *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002). In this manner, an *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002), quoting *Williams*, 529 U.S. at 410, 120 S.Ct. 1495. Thus, to commence analysis under the "contrary to" provision, the applicable Supreme Court precedent must first be identified and evaluated to determine whether it resolves the petitioner's claim. *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir.2000).

█ Second, under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court iden-

tifies the correct governing legal principle from Supreme Court decisions but unreasonably applies that principle to the facts of the prisoner's case. *Lockyer*, 123 S.Ct. at 1174, citing *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. It is not enough that a federal habeas court, in its independent review of the legal question is left with a firm conviction that the state court was erroneous. *Id.*, 123 S.Ct. at 1175. "Under § 2254(d)(1)'s unreasonable application clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.*, quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495. Rather, that application must be objectively unreasonable. *Id. See Also: Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).

Although the Supreme Court has yet to address the precise scope of Section 2254(d)(2), in at least two other cases in the Eastern District of Pennsylvania, that section has been interpreted to require a review of the record to determine whether, "in light of the evidence presented," the state court unreasonably determined the facts. *Lambert v. Blackwell*, Civ. A. No. 01–CV–02511, 2003 WL 1718511 at *15, 2003 WL 1718511 at *28 (E.D.Pa. April 1, 2003); *Abu–Jamal v. Horn*, 2001 WL 1609690 at *12 (E.D.Pa.2001).[8]

### D. Petitioner's Claims.

1. *Failure to Transcribe or Preserve the Notes of Testimony from the Severance Hearing and Two Days of Voir Dire.*

Petitioner alleges that he was denied his right to a meaningful appeal of his convic-

---

**8.** We are, of course, cognizant of the irony which arises here in that these principles are virtually impossible to apply in the instant

case given the State courts' summary dismissal of Mr. Kindler's claims pursuant to his fugitive status.

tions and death sentence as a result of the failure of his prior counsel and the Commonwealth to ensure that all of the notes of testimony relative to his trial were transcribed. In his case, Petitioner avers, not all of the notes of testimony from the severance hearing and the voir dire were transcribed.

It has long been held that in cases where a defendant is represented by a different attorney on appeal than at trial, he may be entitled to the entire transcript of the trial proceedings. *See, e.g., Hardy v. United States,* 375 U.S. 277, 279, 84 S.Ct. 424, 426, 11 L.Ed.2d 331 (1964). When a transcript is less than complete, the court must determine whether the alleged omissions or deficiencies justify a new trial. *United States v. Huggins,* 191 F.3d 532, 536 (4th Cir.1999).

In *Mayer v. City of Chicago,* 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), the Supreme Court held that "in all cases, the duty of the State is to provide the indigent [defendant] with as adequate and effective an appellate review as that given appellants with funds . . . . (citations omitted). In terms of a trial record, this means that the State must afford the indigent a record of sufficient completeness to permit proper consideration of his claims, [but][a] record of sufficient completeness does not automatically translate into a complete verbatim transcript." 404 U.S. at 193–194, 92 S.Ct. at 414. *See Also: Simmons v. Beyer,* 44 F.3d 1160, 1168 (3d Cir.1995). The *Mayer* Court went on to hold that a criminal defendant must first show a "colorable need" for a complete transcript, at which time the burden shifts to the state to show that something less will suffice. *Mayer,* 92 S.Ct. at 415. *See Also: Karabin v. Petsock,* 758 F.2d 966, 969 (3d Cir.1985); *Sulecki v. Zimmerman,* Civ. A. No. 87–2663, 1988 WL 71398, 1988 U.S. Dist. LEXIS 6421 (E.D.Pa. June 30,

1988); *Ross v. Fulcomer,* Civ. A. No. 84–5774, 1986 WL 1091, *2–*3, 1986 U.S. Dist. LEXIS 30245, *6–*7 (E.D.Pa. Jan. 21, 1986). To warrant reversal, the defendant must further make a specific showing of prejudice as a result of the failure to produce the entire transcript. *United States v. Brand,* 80 F.3d 560, 563 (1st Cir.1996); *United States v. Sierra,* 981 F.2d 123, 125 (3d Cir.1992).

In this case, Petitioner argues only that he is entitled to have his capital habeas case reviewed upon a full record and that because there are no transcripts from two of the six days of voir dire of the jury and from one day's pre-trial proceedings on the defense's motion for severance, he has been denied the opportunity to raise possible errors in the jury selection process and to raise claims challenging the fact that his capital sentencing proceedings were conducted with his co-defendant, Scott Shaw.

We do not find Petitioner's bald arguments to demonstrate either a colorable need for the missing transcripts or prejudice justifying reversal of his conviction. Indeed, in reviewing the transcripts from the four days of voir dire which were transcribed, we find no evidence whatsoever of any impropriety in those proceedings, nor does Petitioner cite us to any. Petitioner does not argue that the proceedings on the two non-transcribed days were conducted any differently, and this Court has no reason to believe that the trial court did anything differently. Similarly, there is a transcript from one day of the hearing on the severance motion, which includes the arguments of counsel and the ruling of the trial judge. A summary of the evidence produced with respect to the severance issue is contained therein, as are the reasons behind the trial judge's decision to deny the defense request to sever. Any error from these proceedings and from the

judge's ruling may easily be gleaned from the existing transcript. Accordingly, we find that the record in this matter is sufficiently complete to permit proper consideration of the petitioner's claims in this case. For these reasons, Mr. Kindler's request that his conviction be overturned on this basis is denied.

### 2. Propriety of Jury Instructions on Aggravating and Mitigating Circumstances.

Petitioner next avers that the instructions given to the jury in the sentencing portion of his trial by the trial judge violated the Eighth and Fourteenth Amendments to the U.S. Constitution in that they led the jury to believe that it had to be unanimous in finding any mitigating circumstances. In advancing this argument, Petitioner relies upon *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in which the Supreme Court held that the Constitution prohibits a state from requiring jurors unanimously to agree that a particular mitigating circumstance exists before they may be permitted to consider that circumstance in their sentencing determination.

In *Mills,* the petitioner argued that Maryland's capital sentencing scheme, as explained to the jury by the court's instruction and as implemented by the verdict form, was unconstitutional because it conveyed to the jury the false impression that unanimity was required if any given mitigating circumstance was to be found to exist and thus considered by the jury panel in its sentencing determination. *See, e.g.,* 486 U.S. at 375–376, 108 S.Ct. at 1865–1866; *Abu–Jamal v. Horn,* 2001 WL 1609690 at *117. After examining the instructions and verdict form in that case,

the Supreme Court agreed with Mills that there was:

> "a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration and consequently require the jury to impose the death penalty, is one we dare not risk."

108 S.Ct. at 1870.

*Mills* was decided in 1988, more than four years after Mr. Kindler was convicted of first degree murder, but some three years before he was returned to custody and formally sentenced to death. Not surprisingly, Respondents here argue that because *Mills* was not decided until long after Petitioner's jury conducted its penalty-phase deliberations, the trial judge could not have violated the unanimity preclusion principle established in that case during the trial in November, 1983. Respondents further point out that it would be both ironic and repugnant to apply *Mills* here in that it would effectively be a reward to Petitioner for his escapes from custody and having the Pennsylvania state courts summarily dismiss his post-verdict motions.

While we would certainly agree that Respondents' latter argument would seem to have some merit on its face, we are bound by the decision of the U.S. Court of Appeals for the Third Circuit in *Banks v. Horn,* 271 F.3d 527 (3d Cir.2001), *rev'd in part,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002), *reaffirmed on reconsideration,* 316 F.3d 228 (3d Cir.2003) that *Mills* did not announce a new legal rule, despite the fact that it was decided after

Petitioner's conviction and the dismissal of his post-trial motions and hence is properly retroactively applied.[9] In that case, the petitioner had been convicted of having committed thirteen murders in Luzerne County, Pennsylvania in September, 1982 and was sentenced to death. His conviction and death sentence were upheld on direct appeal and on appeal for state post-conviction relief and Banks thereafter petitioned for a writ of habeas corpus in the U.S. District Court for the Middle District of Pennsylvania. This was denied and he appealed to the U.S. Court of Appeals for the Third Circuit, which reversed the District Court and granted the petitioner a provisional writ of habeas corpus. In so doing, the Third Circuit found merit to Banks' argument that the Pennsylvania state courts had unreasonably applied the holding in *Mills v. Maryland* in reviewing the jury instructions in his case and that his death sentence was unconstitutional. Although the Third Circuit initially did not deem it necessary to analyze whether

*Mills* should have been retroactively applied because the Pennsylvania Supreme Court had applied it, the U.S. Supreme Court disagreed and remanded the case to the Circuit Court to conduct a retroactivity analysis under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See, e.g., Horn v. Banks*, 122 S.Ct. at 2148. On remand, the Third Circuit: (1) found that *Mills* did not announce a new rule of constitutional law for retroactivity purposes [10] and thus was applicable on habeas review of final state court decisions; [11] and (2) re-affirmed its earlier finding that the jury instructions and verdict form utilized in George Banks' death penalty trial were violative of *Mills*. *See, Banks v. Horn*, 316 F.3d at 229–230, 241–242.[12]

 Given that Mr. Kindler's judgment of death was handed down only five months after Mr. Banks', we find that the principles articulated in the *Mills* case must likewise be applied to evaluate the

9. Arguably, we need not conduct a retroactivity analysis in any event given that Petitioner's conviction did not become final until October 11, 1994 when the U.S. Supreme Court denied his petition for writ of certiorari on his direct appeal. *See, e.g., Gray v. Netherland,* 518 U.S. 152, 180, 116 S.Ct. 2074, 2089, 135 L.Ed.2d 457 (1996); *Abu–Jamal,* 2001 WL at *118.

10. Thus, the Court effectively resolved for this Circuit "the close and difficult question upon which the circuits are split," [as to] "[w]hether *Teague* would bar retroactive application of *Mills,*" on which it had "not previously taken a definitive position..." *See: Frey v. Fulcomer,* 132 F.3d 916, 920, n. 4 (3d Cir.1997).

11. In so holding, the Third Circuit noted that the *Mills* Court itself relied heavily on, *inter alia,* the earlier Supreme Court decisions in *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),

which collectively held, in essence, that "in a capital case, 'the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death,"' and the "corollary that 'the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence....'" *See, Banks,* 316 F.3d at 241.

12. In 1990, the Supreme Court further clarified the legal standard for the review of jury instructions when the claim is that the instruction is ambiguous and open to an erroneous interpretation (as was the case in *Mills* ). In *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the Court held that the proper standard in these cases is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Frey v. Fulcomer,* 132 F.3d at 921, quoting *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1197–1198.

jury instructions and verdict sheet used here. Indeed, "proper application of *Mills* requires at the outset that the reviewing court examine the entire jury instructions, posing the 'critical question' whether a reasonable jury could have concluded from the instruction that unanimity was required to find a mitigating circumstance." *Banks*, 271 F.3d at 546. Thus, the court need not determine whether the jury did in fact understand the charge to require unanimity in consideration of mitigating evidence-only whether it was reasonably likely. *Banks*, 271 F.3d at 547, citing *Boyde*, 494 U.S. at 380, 110 S.Ct. at 1197–98 and *Mills*, 486 U.S. at 384, 108 S.Ct. at 1870.

In this case, the trial court issued the following instructions:

Now, before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters: 1, the aggravating circumstances specified in subsection "D" as to which there is some evidence and you have them there. Then the mitigating circumstances specified in subsection "E" as to which there is some evidence.

Now, the aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt. Mitigating circumstances must be proved by the defendant by a preponderance of the evidence. A preponderance of the evidence is somewhat less proof than is required for a reasonable doubt.

Now, the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in that list, subsection "D" and no mitigating circumstances or if the jury unanimously finds one or more aggrava-

ting circumstances which outweigh any mitigating circumstances.

The verdict must be a sentence of life imprisonment in all other cases. The court may in its discretion discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment. The court shall instruct the jury on any other matters that may be just and proper under the circumstances ....

(N.T. 11/16/83, 29–30, 152–153) [13].

A comparison of Mr. Kindler's instructions with those given to Mr. Bank's jury is instructive. In *Banks*, the instructions were as follows:

Members of the jury, you must decide whether the defendant in this case is to be sentenced to death or to life imprisonment on each of the Informations upon which you have returned a verdict of guilty of murder in the first degree. The sentence you will impose will depend on your findings concerning aggravating and mitigating circumstances. The Crimes Code in this Commonwealth provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.

Remember, under the law of this Commonwealth, your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggrava-

---

**13.** Judge Geisz gave these instructions twice-first at the outset of the sentencing hearing and then again at the close of the hearing, after testimony and arguments of counsel had concluded.

ting circumstances which then outweigh any mitigating circumstances.

In all other cases, your verdict would be life imprisonment. Once again, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances by a preponderance of the evidence.

If, after conscientious and thorough deliberations, you are unable to agree on your findings and your verdict, you should report that to me.

*See,* 271 F.3d at 546–547.

Following the procedure utilized in *Frey,* the Third Circuit examined the relevant portion, "you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find at least one aggravating circumstance which then outweigh any mitigating circumstances...," and concluded that the instructions were in themselves ambiguous, allowing for a jury to infer that the requirement of unanimity applied both to aggravating and mitigating circumstances. *Banks,* 271 F.3d at 548.[14] Further, reasoned the Court, the likelihood of confusion was heightened when the judge attempted to clarify the difference between aggravating and mitigating circumstances by explaining that the defendant had the burden of proving mitigating circumstances by a preponderance of the evidence but failed to mention that unanimity was not required for finding a mitigating circumstance. *Id.*

In the case at bar, while the instructions as a whole do not precisely mirror those given in *Frey* and *Banks,* the relevant portions do. Indeed, as in both *Banks* and *Frey,* the trial court instructed the sentencing jury that:

"[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in that list, subsection 'D' and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases."

and

"the aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt. Mitigating circumstances must be proved by the defendant by a preponderance of the evidence. A preponderance of the evidence is somewhat less proof than is required for a reasonable doubt."

Again, the importance of a unanimous finding was discussed within very close proximity to the mitigating circumstances clause and there was no mention that unanimity was not required for a mitigating circumstance to be found. Hence, considering the instructions given here as a whole, we find that there is a "reasonable likelihood that the jury applied them in a manner that prevented the consideration of constitutionally relevant evidence." *Banks,* 271 F.3d at 549, quoting *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190.

---

**14.** The *Frey* Court examined instructions nearly identical to those given in *Banks* and found that when viewed in their entirety, those instructions "emphasize[d] the importance of a unanimous finding, using the phrase frequently and in close proximity to—within seven words of—the mitigating circumstances clause." Thus, reasoned the Court, "[c]onsidering this close proximity—the clause is, to the ear and to the mind, one sound bite—it is quite possible that a juror would, regardless of other qualifying language, believe that mitigating circumstances had to be found unanimously." *Frey,* 132 F.3d at 923.

Moreover, we find that this error was only compounded by the verdict slip utilized in this case. Specifically, the verdict slip read as follows:

We, the jury empaneled in the above entitled case, having heretofore determined that the defendant, is guilty of murder of the first degree, do hereby find:

## AGGRAVATING CIRCUMSTANCE(S)

The victim was a fireman, peace officer, or public servant concerned in official detention who was killed in the performance of his duties ( )

The defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim ( )

The victim was being held by the defendant for ransom or reward, or as a shield or hostage ( )

The death of the victim occurred while defendant was engaged in the hijacking of an aircraft ( )

The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses ( )

The defendant committed a killing while in the perpetration of a felony ( )

In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense ( )

The offense was committed by means of torture ( )

The defendant has a significant history of felony convictions involving the use or threat of violence to the person ( )

The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense ( )

## MITIGATING CIRCUMSTANCE(S)

The defendant has no significant history of prior criminal convictions ( )

The defendant was under the influence of extreme mental or emotional disturbance ( )

The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired ( )

The age of the defendant at the time of the crime ( )

The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under Section 309 (relating to duress), or acted under the substantial domination of another person ( )

The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts ( )

The defendant's participation in the homicidal act was relatively minor ( )

Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense ( )

| The aggravating circumstance(s) outweigh the mitigating circumstance(s) | YES ( ) NO ( ) |
| --- | --- |

We the jury render the following sentencing verdict:

DEATH ( )
LIFE IMPRISONMENT ( )

The jury found two aggravating circumstances to exist-that the victim was a prosecution witness to a felony committed by the defendant who was killed for the purpose of preventing his testimony and that the killing occurred while the defendant was perpetrating a felony. No mitigating circumstances were found. In reviewing the verdict slip, we note that nowhere does it make any distinction between either the different burdens of proof attendant to finding aggravating and mitigating circumstances or the different requirements for unanimity. We find that these omissions, when coupled with the instructions given, only enhance the likelihood that the jury undertook to consider the mitigating circumstances in this case using the same procedures by which it considered the aggravators. It is for this reason that we are compelled to grant the writ of habeas corpus and direct that petitioner either be given a new sentencing hearing or sentenced to life imprisonment.[15]

3. *Sufficiency of the "Proportionality Review" of Petitioner's Death Sentence*

■ Petitioner also seeks the vacation of his death sentence on the grounds that the "proportionality review" performed by the Pennsylvania Supreme Court did not provide him with the meaningful appellate review required by 42 Pa.C.S. § 9711 and the Eighth and Fourteenth Amendments.

■ Contrary to Petitioner's assertion, the Eighth Amendment does *not* require that a comparative proportionality review be conducted in death penalty cases, even where a death-sentenced defendant requests one. *See, Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Although some courts have held that due process standards apply where state law provides for a proportionality review, it is unclear whether a state proportionality review statute creates any cognizable liberty interest for due process purposes under Third Circuit law. *See, Riley v. Taylor,* 277 F.3d 261, 311 (3d Cir.2001); *Foster v. Delo,* 39 F.3d 873, 882 (8th Cir.1994); *Sullivan v. Delaware,* Civ. A. No. 96–281–SLR, 1998 WL 231264, 1998

---

**15.** We note again Respondents' contention that this claim is not properly considered given that Petitioner has procedurally defaulted it by virtue of his escape from custody. While we stand by our earlier conclusion, as dictated by *Doctor v. Walters, supra,* that the fugitive forfeiture rule was not an independent and adequate basis for precluding federal review, we would also note our agreement with Judge Giles' reasoning and conclusion in

*Yarris v. Horn,* 230 F.Supp.2d 577, 590–591 (E.D.Pa.2002) that a *Mills* claim is a record-based claim which the Pennsylvania Supreme Court had the obligation to consider on its review of Petitioner's death sentence for proportionality and to ensure that it was not the product of passion, prejudice or any other arbitrary factor. Accordingly, we would also find that, as to this claim, Petitioner has exhausted his state court remedies.

U.S. Dist. LEXIS 6471 (D.Del. April 30, 1998); *Banks v. Horn,* 939 F.Supp. 1165, 1175 (M.D.Pa.1996). In evaluating a claim that a state court erred in conducting its proportionality review, a federal court may only inquire into whether the state court "undertook its proportionality review in good faith and found that the defendant's sentence was proportional to the sentences imposed in cases similar to his." *Riley, supra,* quoting *Walton v. Arizona,* 497 U.S. 639, 656, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *rev'd on other grounds, Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). At the time of Petitioner's sentencing in 1991, 42 Pa.C.S. § 9711(h)(3)(iii) read:

> The Supreme Court shall affirm the sentence of death unless it determines that:
> (iii) "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." [16]

Here, the Pennsylvania Supreme Court did conduct its mandated review of the record in Mr. Kindler's case to ascertain whether sufficient evidence was presented at trial to support his first degree murder conviction and the finding of at least one aggravating circumstance and whether the death sentence was the product of passion, prejudice or any other arbitrary factor or was excessive or disproportionate to the penalty imposed in similar cases. *See Generally: Commonwealth v. Kindler,* 536 Pa. 228, 639 A.2d 1, 4 (1994). In addition to finding that there was indeed sufficient evidence to support the jury's findings of guilt and aggravating circumstances to justify imposition of the death penalty, the Supreme Court concluded:

> We have studied this record and conclude that the sentence of death, being

mandated, is neither excessive nor disproportionate to the penalty imposed in similar cases. *See, Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984) (and Appendix attached thereto).

> Finally, after our review of this record, we conclude that the sentence of death was a product of the evidence and not a product of "passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3).

*Kindler,* 639 A.2d at 7.

Petitioner contends that in conducting the proportionality review in his case, the Pennsylvania Supreme Court presumably relied upon the database compiled and maintained by the Administrative Office of the Pennsylvania Courts of all cases in which a first degree murder conviction is obtained. However, Petitioner asserts, the database is flawed in that it has no means by which to include information about those cases where a defendant has pled guilty, where the jury is hung, or cases where a prosecutor chooses not to go forward with a first degree murder prosecution nor does it collect and compare information on aggravating circumstances found with mitigators found. According to Mr. Kindler, the database is impermissibly "skewed toward death" because it cannot perform any sort of qualitative analysis.

■ While Petitioner may well be correct in his assertion that the AOPC database was flawed and that the system for conducting proportionality review in Pennsylvania was less than perfect, we nevertheless cannot find any requirement that such review be flawlessly conducted, even assuming that it gives rise to a liberty

---

**16.** Section 9711(h)(3)(iii) was abolished by statute dated June 25, 1997.

interest. Petitioner has offered no evidence or argument to suggest that the Supreme Court conducted its review in bad faith. Indeed, where the state law furnishes sufficient guidelines to the sentencer, there is a presumption that the death sentence was not wantonly and freakishly imposed and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment. *Sullivan v. Delaware*, and *Banks v. Horn*, both *supra* and quoting *Walton v. Arizona*, 497 U.S. at 655–56, 110 S.Ct. 3047 and *McCleskey v. Kemp*, 481 U.S. 279, 306, 308, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Because there is no federal constitutional right to proportionality review, if the federal court finds that the review was undertaken in good faith, it cannot look behind the state court's conclusion of proportionality to consider whether the state court misapplied state proportionality law. *Riley v. Taylor*, 277 F.3d at 311–312.

Thus, as proportionality review is not constitutionally required and Petitioner has not presented any evidence to suggest that the Pennsylvania Supreme Court did not conduct its review in good faith, we cannot grant Petitioner habeas relief on this basis. *See Also: Laird v. Horn*, 159 F.Supp.2d 58, 124–125 (E.D.Pa.2001).

4. *Sufficiency of Petitioner's Trial Counsel's Performance at the Penalty Phase of Trial.*

Mr. Kindler next submits that his sentence should be vacated because his trial counsel was constitutionally ineffective in failing to investigate his family background and upbringing and failing to have his mental health evaluated. Petitioner avers that had his attorney done so, he would have uncovered mitigating evidence that could have been presented to the jury in the sentencing phase of his trial.

 The U.S. Supreme Court has long recognized that the right to counsel under the Sixth Amendment and the Due Process clauses is crucial to protect the fundamental constitutional guarantee of a fair trial. *See: Strickland v. Washington*, 466 U.S. 668, 684–85, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding and the right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Id.*, quoting *Adams v. United States ex. rel. McCann*, 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942) and *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932). Of course, the right to counsel means the right to the *effective* assistance of counsel. *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984).

 It is now well-established that the standard governing the evaluation of ineffective assistance of counsel claims is that of reasonably effective assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Thus, when a convicted defendant complains of the ineffectiveness of counsel's assistance he must first show that counsel's performance was deficient, i.e., that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Berryman v. Morton*, 100 F.3d

1089, 1094 (3d Cir.1996).[17]

 Second, the defendant must show that the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In order to establish prejudice, a defendant need not demonstrate that the outcome of the proceeding would have been different, but only that there is a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Marshall v. Hendricks,* 307 F.3d 36, 85 (3d Cir.2002). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 359, 154 L.Ed.2d 279, 285 (2002); *Lambert v. Blackwell, supra,* 2003 WL 1718511 at *33.

 Finally, in evaluating counsel's performance, reviewing courts must be "highly deferential" to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight. *Marshall,* 307 F.3d at 85, quoting *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065. There is a strong presumption that, under the circumstances, counsel's challenged actions might be considered sound strategy. *Buehl,* 166 F.3d at 169. Thus, the court is not engaging in a prophylactic exercise to guarantee each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each defendant a fair trial, with constitutionally competent counsel. *Marshall,* 307 F.3d at 85. In order to assess an effectiveness claim properly, the court "must consider the totality of the evidence before the judge or jury." *Id.,* quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

Of course, the Supreme Court has long recognized the importance which mitigating evidence plays in ensuring that a capital trial is at once consistent and principled but also humane and sensible to the uniqueness of the individual. *See: Eddings v. Oklahoma,* 455 U.S. at 110–111, 102 S.Ct. at 874–875, and *Lockett v. Ohio,* 438 U.S. at 604–605, 98 S.Ct. at 2964–2965. The Court has further held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Peterkin v. Horn,* 176 F.Supp.2d at 378, citing, *inter alia, Penry v. Lynaugh,* 492 U.S. 302, 317, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989), *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

 In the case at hand, five friends of Joseph Kindler and his family testified at the sentencing portion of Petitioner's trial. While each witness testified slightly differently, the gist of all of their testimony was that Mr. Kindler was a good, hardworking, kind person who could still do some good for society even from behind bars particularly in view of his unique skills and talents with electronics. Each witness asked that the jury impose a sentence of life imprisonment, rather than death. Petitioner, however, does not take exception to the admission of this evidence (which was clearly mitigating in nature) but rather contends that his counsel did not go far enough in his preparation for the sentencing portion of his trial.

---

**17.** Stated otherwise, it must be shown that counsel's performance was so deficient that it fell below an objective standard of reasonableness under prevailing professional norms. *Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986); *Buehl v. Vaughn,* 166 F.3d 163, 169 (3d Cir. 1999), citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064.

Indeed, according to the affidavit of Daniel Paul Alva, Esquire, Petitioner's trial counsel, Petitioner's case was the first capital case he had ever tried and he did not conduct a penalty phase or mitigation investigation simply because it never occurred to him to do so. He thus did not interview Petitioner or any of his family members about Petitioner's upbringing, educational or medical histories nor did he endeavor to obtain any psychological or mental health evaluation of his client. Having now reviewed the affidavits and reports provided to him by Mr. Kindler's present counsel, Mr. Alva acknowledges that he would have learned that Petitioner was raised in a violent, chaotic and abusive home, that his mother had a drinking problem, that he had suffered two head injuries (neither of which resulted in hospitalization), and that he was suffering from mood and personality disorders. Mr. Alva avers that he would have presented this evidence to the jury had he known about it, and that its non-presentation was due only to his ignorance and not to any strategy on his part.

 As *Strickland* makes clear,

"...strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

466 U.S. at 690–691, 104 S.Ct. at 2066. Given Mr. Alva's admission that he neither undertook any investigation nor made a strategic decision that such investigation was unnecessary, we are compelled to find that, in this regard, his representation fell below an objective standard of reasonableness. *See Also: Wiggins v. Smith,* —— U.S. ——, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. at 390–391, 120 S.Ct. at 1511.

However, to merit relief, Petitioner must also show prejudice, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002), quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Williams,* 120 S.Ct. at 1512.

 Although prejudice may be presumed in certain Sixth Amendment contexts (such as actual or constructive denial of assistance of counsel altogether or various kinds of state interference with counsel's assistance), in most cases a case-by-case analysis will be necessary with the defendant bearing the burden of affirmatively proving prejudice. *See, Williams,* 120 S.Ct. at 1512 and *Strickland,* 104 S.Ct. at 2067. In this regard, the Third Circuit has held that *Strickland* requires an analysis based on a complete record and that the prejudice test mandates that once the areas where counsel was found to be ineffective are identified, the redefined presentation must be measured against the reasonably probable outcome in a given case. *Marshall v. Hendricks,* 307 F.3d at 115. In the penalty phase of a capital case, this involves a delicate process whereby the reviewing court re-weighs the aggravating

and mitigating factors with all of the corrections taken into account. *Id.*

■ In application of these principles, we cannot find that a sufficient showing has been made that the outcome of the penalty phase of Petitioner's trial would have been different. Here, the mitigating evidence at issue relates to Mr. Kindler's mental and emotional health and make-up. To give rise to a mitigating circumstance in this case, the evidence would have to demonstrate that "the defendant was under the influence of extreme mental or emotional disturbance," that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," or fall within the parameters of mitigation evidence "concerning the character and record of the defendant and the circumstances of his offense." According to the reports from the psychologist and psychiatrist who evaluated Petitioner, he suffers from "mild impairment in manual praxis due to motor perseveration and delayed verbal recall, moderate impairment in speed of visual tracking and moderate to severe impairment in tests of speed of set shifting and logical deductive reasoning," along with "Mood Disorder" and "Narcissistic Personality Disorder." As psychiatrist Robert Fox further opined,

> "[p]eople with a history of trauma like that Mr. Kindler experienced and people with frontal lobe impairment frequently have poor impulse control, poor judgment, and poor emotional control. In Mr. Kindler's case, these impairments are combined with his underlying personality traits of grandiosity. Moreover, when his mood is hypomanic, the tendency toward hypomania and poorly thought out, risk taking behavior is intensified. It is my opinion to a reasonable degree of psychiatric certainty that

the combination of these impairments in Mr. Kindler's case constitutes an extreme mental or emotional disturbance."

This evidence then, could have been sufficient to establish the mitigating factor of extreme mental or emotional disturbance. In weighing this evidence against the aggravating factors, however, we do not believe that the jury could have determined that this mitigating factor adequately outweighed the two aggravating factors found (that the murder was committed to prevent the victim from testifying against the petitioner in a felony matter and that it was committed while in the course of the perpetration of another felony). In any event, while this is a very close question, we find that this evidence is insufficient to undermine confidence in the outcome of the sentencing verdict. So saying, the petition will be denied on this basis.

5. *Constitutional Propriety of Conducting the Sentencing Portion of Petitioner's Trial with his Co-Defendant.*

Mr. Kindler next asserts that his constitutional rights under the Eighth and Fourteenth Amendments were further violated by the conduct of the sentencing portion of his trial with his co-defendant, Scott Shaw, and by the prosecutor's arguing to the jury that Petitioner should be sentenced to death but Shaw should not.

■ It is true that there is a general requirement of individualized sentencing and a more specific requirement under the Eighth and Fourteenth Amendments that there be an individualized consideration of mitigating factors in capital cases. *See: Stringer v. Black*, 503 U.S. 222, 231, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367, 380 (1992); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Indeed, what is important at the stage of the proceedings in which the jury chooses

between life or death, is an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 251 (1983), citing, *inter alia, Eddings v. Oklahoma,* 455 U.S. at 110–112, 102 S.Ct. 869 and *Lockett,* 438 U.S. at 601–605, 98 S.Ct. 2954.

 The U.S. Supreme Court has noted that "improper joinder does not, by itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Laird v. Horn,* 159 F.Supp.2d 58, 96 (E.D.Pa.2001), quoting *United States v. Lane,* 474 U.S. 438, 446, n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Generally speaking then, the decision on whether or not to grant a motion for severance rests within the sound discretion of the trial court and a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial. *United States v. Hart,* 273 F.3d 363, 370 (3d Cir.2001); *U.S. v. Console,* 13 F.3d 641, 655 (3d Cir.1993); *Laird,* 159 F.Supp.2d at 96, citing, *inter alia, Cummings v. Evans,* 161 F.3d 610, 619 (10th Cir.1998). *See Also: Zafiro v. United States,* 506 U.S. 534, 538–540, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 212–213 (1997), *cert. denied,* 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998); Pa.R.Crim.P.Nos. 582, 583. It should be noted that mutually antagonistic defenses are not prejudicial *per se;* the fact that hostility exists between the defendants or that one defendant may try to save himself at the expense of the other constitutes insufficient grounds to require severance. *Zafiro,* 506 U.S. at 538, 113 S.Ct. at 938; *Marinelli,* 690 A.2d at 213.

 In this case, Petitioner argues that the trial court's denial of his severance motion enabled the Commonwealth to contrast him with Mr. Shaw, use Mr. Shaw's mitigating evidence as an improper aggravating factor against him and portray him as especially deserving of the death penalty. He does not dispute that he and Mr. Shaw were charged with conspiring to and murdering Mr. Bernstein nor does he allege that the crux of either his or Mr. Shaw's defense was that the other committed the offenses charged while maintaining his own innocence. Thus, Mr. Kindler and Mr. Shaw did not have mutually antagonistic or mutually exclusive defenses. In view of this and since the trial court had no knowledge of what the prosecutor would argue at the time it decided the severance motion, we thus cannot find any error in the trial court's refusal to sever the trials of Messrs. Kindler and Shaw.

 However, Petitioner also takes exception to the prosecutor's arguing to the jurors that they should find mitigation as to Mr. Shaw. In so doing, Petitioner submits, the prosecutor improperly introduced a non-statutory aggravator and effectively told the jury that there was no available mitigation as to him. The objected-to comments are as follows:

"I did not state and argue emphatically in reference to Mister Shaw. There has been testimony that you heard that Mister Shaw was in fact led. You have heard testimony from his grandmother, as a matter of fact, that he in fact got into trouble because he was led as a result of older people, because of the failure perhaps at times to have sufficient male companionship among other things.

If that were the case and you must accept that does not lessen in terms of guilt of a crime indeed not as you had found.

But you must consider in reverse what and where that puts the individual that organized and effectuated this particular act, for we then could find that that man has not only forever ruined the life of an individual so that he is dead but ruined the life of another individual because of his influence, intensity, clarity of purpose and methods in detail, tragically, meticulous moments and I again refer you to that knot. That is what we are talking about. If you believed that Mister Shaw in fact was led, if you believe that he, as a, at the time, 16 year old boy, who was under the influence of older people and if you believe that either indirectly or whatever, there was a certain amount of coercion, although not sufficient to negate the crime, if you would accept that, well yes, you could find of course mitigating circumstances in that.

So also you must consider, however, even there the aggravating circumstances that I had mentioned. That's up to you to decide. But in reference to Mister Kindler, it's an entirely different story. Because with that we are talking about, a leader, the actor, the one with the idea, the one with the motive, the one with the push throughout, the one who directed the disposal of the material, the one that came back and said he's not dead yet; I had to use a concrete stone to drop him in the river. Ladies and gentlemen, that alone. We are talking about weighing, we are talking about weighing of circumstances to see where the aggravating and the mitigating would apply and how they would stand, how they in fact would be in reference to weighing each other."

(N.T. 11/16/83, 141–143).

Although we find no error in the trial court's initial decision to permit Messrs. Kindler and Shaw to be tried together, we are constrained to find that, by making the preceding arguments, the prosecutor effectively created antagonism between Mr. Kindler and Mr. Shaw's defenses in this case and thereby crossed the constitutional line. It is particularly interesting to note that it was the prosecutor, not Mr. Shaw's attorney, who elicited much of Mr. Shaw's mitigating evidence when he cross-examined Mr. Shaw's grandmother and in fact, Mr. McGill argued this mitigating evidence nearly as forcefully as did Mr. Shaw's own counsel. (N.T. 11/16/83, 57–59). The Supreme Court has held that because the use of a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty, the death sentence may have to be invalidated unless it is sufficiently supported by other valid, aggravating factors and the weighing process has otherwise been unaffected. *See, Stringer v. Black*, 503 U.S. 222, 235–236, 112 S.Ct. 1130, 1139, 117 L.Ed.2d 367 (1992) and *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). By eliciting this mitigating evidence on behalf of Mr. Shaw and making the preceding argument, we find that Mr. McGill introduced an invalid, vague, aggravating factor against Mr. Kindler, *to wit,* being the "lead" actor in the crime. As we have previously concluded that Petitioner's death sentence must be overturned on other grounds, it is not otherwise supported in this case and we would therefore vacate it on the basis of this error as well.

6. *The propriety of the prosecutor's arguments at the guilt and sentencing phases of the trial.*

Petitioner next asserts that the prosecutor engaged in misconduct at both the guilt and penalty phases of his trial by: (1) telling the jury in his guilt phase closing argument that an acquittal would be final but a guilty verdict could be appealed; (2)

telling the jurors that there were only four witnesses to Mr. Bernstein's murder and that of those witnesses Mr. Bernstein was dead and could not testify; (3) telling the jury in his sentencing phase closing argument that it was the "position" of his office that Petitioner should be put to death but Mr. Shaw sentenced to life imprisonment, (4) telling the jurors that giving Petitioner the death penalty would "make them feel good;" and (5) making impermissible references to the Bible.

■■■■■ It is well settled that a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Indeed, a petitioner will not succeed merely because the prosecutor's actions "were undesirable or even universally condemned." *Young v. Vaughn,* Civ. A. No. 00–3512, 2001 WL 34368759 at *4, 2001 U.S. Dist. LEXIS 23403 at *13 (E.D.Pa. Nov. 20, 2001), quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The appropriate standard of review on habeas corpus of a claim of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.; United States v. Miles,* 53 Fed.Appx. 622, 630 (3d Cir.2002). Thus, habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned. *Darden,* 477 U.S. at 180–181, 106 S.Ct. 2464; *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868; *Choi Chun Lam v.*

*Kelchner,* 304 F.3d 256, 271 (3d Cir.2002). Finally, the arguments of counsel must be judged in the context in which they were made, bearing in mind that arguments of counsel carry less weight with a jury than do instructions from the court. *Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316, 331–332 (1990).

■■■■■ In his closing argument at the guilt phase of the petitioner's trial, the prosecutor prefaced his challenged remarks by discussing the importance of the jury's job:

"I contrast that with the very important right that all of us have that you right now are in the midst of exercising. And that is the right of the jury to indeed become part of the law enforcement process. The right of the jury to make a decision based on the law that we are all governed by and make immediate and definite to a degree the action that would follow.

By that I mean whereas at times we may wonder, speculate about what will happen in the future, all of you, the 12 of you, when you do reach a verdict, a result will indeed occur."

He then went on to say:

"Just as if you would find the defendants not guilty, they would be right in reference to this case to stand up and just leave and never again think about this particular point because they're left, they're gone and there's nothing I can do, the judge or anybody present to in any way reverse that process.

That, ladies and gentlemen, is the power that all of you have. That's immense. That's awesome and most important. You also have the power, if you were to convict, to in fact render a judgment on facts in accordance with the law with the result occurring, that is, a conviction and of course, there is—where there are con-

victions, possibilities of appeal and reversal and those sorts of things which are strictly legal procedural things, that may be true.

However, to a certain measure, if you should find them guilty, it would be final. But there is no question if they were found not guilty, it would be final." (N.T. 11/14/83, pp. 102–103).

Petitioner cites *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) as support for his contention that these remarks constituted misconduct mandating reversal. *Caldwell*, however, held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–329, 105 S.Ct. at 2639. In *Caldwell*, the prosecutor asserted in his closing argument at the sentencing portion of the defendant's trial that he was

"...in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know— they know that your decision is not the final decision. My God, how unfair can that be? Your job is reviewable. They know it. Yet they...Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For as they know, as I know and as Judge Baker has told you, that the decision you render is automatically reviewable by the Su-

preme Court. Automatically, and I think it's unfair and I don't mind telling them so."

472 U.S. at 325–326, 105 S.Ct. at 2637–2638.

While the argument made in *Caldwell* bears some similarities to that made here, the prosecutor in Mr. Kindler's case made his remarks during his closing in the *guilt-innocence* phase of the trial—not at sentencing. Indeed, the Supreme Court has subsequently read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Porter v. Horn*, 276 F.Supp.2d 278, 363 (E.D.Pa. 2003), quoting *Darden v. Wainwright*, 477 U.S. 168, 183, n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). *See Also, Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 2009–2010, 129 L.Ed.2d 1 (1994). We therefore do not find *Caldwell* dispositive.

Furthermore, prosecutorial misconduct does not always warrant the granting of a new trial. *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir.1995). To be sure, the Supreme Court has acknowledged that given "the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *Id.*, quoting *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). For these reasons, the Supreme Court has held that an appellate court should not exercise "its supervisory power to reverse a conviction when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." *Id.*

■ The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review depends on whether the error was constitutional or non-constitutional. *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir.2003). Non-constitutional error is harmless when it is highly probable that the error did not contribute to the judgment. High probability, in turn, requires that the court possess a sure conviction that the error did not prejudice the defendant. *Id.*, citing *Zehrbach*, 47 F.3d at 1265. If the error was constitutional, the court may affirm only if the error is harmless beyond a reasonable doubt. *Id.*, citing *United States v. Molina–Guevara*, 96 F.3d 698, 703 (3d Cir. 1996).

Turning now to an examination of the prosecutor's remarks in context, we find that while they were indeed undesirable, they did not so infect the trial with unfairness as to deny petitioner his rights to due process of law. Shortly after the closing arguments, the trial judge instructed the jury that:

"...Your duty is to find the facts independently from the evidence and from the evidence alone. Neither the opinion of the district attorney, nor counsel for the defense, nor the opinion of this court, that is, myself, as the trial judge, nor our interpretation of the evidence is binding on you. You will be careful not to be influenced by any opinion that may filter into your minds through this charge of the court. Similarly, opinions expressed by counsel should not draw you to your conclusions unless supported by evidence and the inference properly drawn therefrom..."

(N.T. 11/14/83, 181–182). The judge did not instruct the jury that a guilty verdict was not final and could be appealed nor did he instruct the jury that a not guilty verdict could not be appealed. Thus, reviewing the prosecutor's comments in the context of the whole and being mindful that counsel's remarks are given less weight than a trial court's instructions and of the overwhelming evidence of the petitioner's guilt presented at the trial, we conclude that the prosecutor's remarks, while admittedly improper, do not rise to the level of a constitutional violation and constituted harmless error at most.

■ We reach a similar conclusion with respect to the prosecutor's comments regarding the decedent's inability to testify. The objected-to remarks are as follows:

"...Ladies and Gentlemen, let it be known that often cases we do in our situations, deal necessarily with codefendants. It is clear from you that from what you see perhaps that isn't someone to like, someone to empathize with, someone to care. Someone perhaps to detest. But that again is not your particular role. In many cases, you will hear from codefendants and particularly in homicide cases for the obvious reasons. In this particular crime, what we have, the time of that brutal murder, we have 4 people involved. One person cannot possibly testify, since he's dead. Other 2 individuals who are living are defendants and the other defendant is a witness. There was simply from what you have heard and from the evidence presented, no one else present...."

(N.T. 11/14/83, 108–109).

Mr. Kindler argues that these remarks were intended to and had the effect of inflaming and unfairly prejudicing the jury against him and was also a comment on his right to remain silent at his trial. Certainly, it is true that because of the surpassing importance of the jury's penalty determination a prosecutor has a heightened duty to refrain from conduct designed to in-

flame the jury's passions and prejudices. However, in reviewing these remarks in context, it is clear that they were not unduly prejudicial, but were rather an appropriate response to the defense arguments regarding the testimony of the prosecution's chief witness, Michelle Raifer. *See, Lesko v. Lehman,* 925 F.2d 1527, 1541 (3d Cir.1991). We therefore find no impropriety in these statements.

■■■ Moreover, while the Fifth Amendment forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt, statements regarding the absence of facts in the record need not be taken as comment on a defendant's failure to testify. *U.S. v. Brennan,* 326 F.3d at 187, citing, *inter alia, Griffin v. State of California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) and *Bontempo v. Fenton,* 692 F.2d 954, 959 (3d Cir.1982). Rather, a remark is directed to a defendant's silence when the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. *Id.* Applying these criteria, we cannot find that these comments were directed at or reflected the petitioner's exercise of his right to remain silent at trial. So saying, the application for a habeas writ on these grounds is denied.

Petitioner additionally challenges a number of remarks made by the prosecutor during his closing argument at the sentencing phase of the trial. Specifically, Mr. Kindler contends that the prosecutor violated his rights to due process by (1) vouching for his case by telling the jurors that it was the "position" of his office that Petitioner should be put to death but Mr.

Shaw sentenced to life imprisonment, (2) telling the jurors that giving Petitioner the death penalty would "make them feel good;" (3) making impermissible references to the Bible and (4) arguing to the jurors that they should find mitigation as to Mr. Shaw, effectively telling them that there was no available mitigation for Mr. Kindler.[18]

■■■ It is well-settled that a prosecutor may not try to buttress his case by vouching for the credibility of a government witness. *United States v. Molina–Guevara,* 96 F.3d at 704. Vouching is an impermissible assurance by the prosecuting attorney of the credibility of a government witness through personal knowledge or by other information outside of the testimony before the jury. *United States v. Dispoz–O–Plastics, Inc.,* 172 F.3d 275, 283 (3d Cir.1999). Two criteria must be met to find vouching: (1) the prosecutor must assure the jury that the testimony of a government witness is credible; and (2) this assurance must be based on either the prosecutor's personal knowledge, or other information not contained in the record. *United States v. Milan,* 304 F.3d 273, 290 (3d Cir.2002); *United States v. Saada,* 212 F.3d 210, 225 (3d Cir.2000). The defendant must be able to identify as the basis for the prosecutor's comment, explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. *U.S. v. Brennan,* 326 F.3d at 183; *United States v. Walker,* 155 F.3d 180, 187 (3d Cir.1998).

■■■ In this case, the petitioner first objects to the following portion of the prosecutor's closing argument at the sentencing phase of the trial:

---

**18.** As we have already addressed this last argument in Section 5 above in conjunction with Petitioner's argument regarding the trial court's denial of his motion to sever, we see no need to again address it here.

"Let me at this point, ladies and gentlemen, tell you the position, the position of the office, the position of the Commonwealth. We in this case seek and urge through the evidence and the law the death penalty against Joseph Kindler. In reference to Scott Shaw, I will argue and present both of the sides and it is up to you to decide against both of these particular individuals what penalty you feel appropriate. That would be the case no matter what our office's position is but I felt from the outset here that I would let you know that the urging would be done based on the evidence would be against Mister Kindler. That does not mean that you cannot or would not, based on the evidence and the law return such a penalty if you felt appropriate, against Mister Scott Shaw. That is your power and if you find it your duty in connection with what the law is, then I am sure you would do it but I, at least, wanted to let you know that now."

(N.T. 11/16/83, 122–123).

In considering this portion of the prosecutor's argument in the context of the record as a whole, we find it clearly constituted improper vouching and harmful, constitutional error. Indeed, the entire premise of the prosecutor's argument was that the Commonwealth possessed even stronger evidence of Joseph Kindler's guilt and statutory aggravators than that presented to the jury and that was why "the urging would be done based on the evidence . . . against Mister Kindler." By contrasting Petitioner with his co-defendant and arguing in favor of the death penalty as to him alone, it further appears that the goal of the prosecutor was to use Mr. Kindler as a "sacrificial lamb" in order to secure at least one death penalty conviction. We therefore find blatant misconduct on the part of the prosecutor here and we are compelled to grant the petition for writ of habeas corpus on the basis of this argument.

■ Petitioner next argues that the prosecutor violated his constitutional rights by telling the jury that the return of a death penalty against him would make them "feel good." In this regard, the prosecutor specifically argued:

"What I ask you to do is to look at the aggravating circumstances and look at what you might believe is a mitigating circumstance. You may have one aggravating circumstance for the sake of argument and 10 mitigating circumstances and that one aggravating could outweigh because of the severity of it. That's where the weighing comes down. You on the other hand, could have one mitigating and outweigh the aggravating. That would be up for you. That's where you come into play. I do not ask you to stand up here and do anything other than to apply the law and find it reasonably.

What I do ask all of you and I mean this sincerely, because I know it is tough, been here before and I know and I hear and when I understand that people that find things difficult, feel good afterwards for applying the law. For recognizing that their part, their position, their step, in the law enforcement process, was completed. They had done it, the same law that protects the defendants throughout the trial as properly it should, is the same law that we all must follow in applying the appropriate penalty."

(N.T. 11/16/83, 144–145).

The prosecutor did not tell the jury that it would feel good if it gave Joseph Kindler the death penalty. Rather, the gist of the prosecutor's argument here was to acknowledge the common "good feeling" of relief that one generally has after a difficult decision has been made. Thus, after

reviewing these remarks in context, we do not find them to be improper and we decline to grant the writ on these grounds.

 Petitioner also submits that prosecutorial misconduct occurred when Mr. McGill discussed his own "Christian values" and referred to the Bible.

Most, if not all of the federal and state courts that have considered the issue have condemned the use of religious authority in death penalty case arguments. *See, e.g., Sandoval v. Calderon,* 241 F.3d 765, 776–777 (9th Cir.2001), citing, *Coe v. Bell,* 161 F.3d 320, 351 (6th Cir.1998); *Bennett v. Angelone,* 92 F.3d 1336, 1346 (4th Cir. 1996); *Cunningham v. Zant,* 928 F.2d 1006, 1019–20 (11th Cir.1991); *United States v. Giry,* 818 F.2d 120, 133 (1st Cir. 1987); *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 644 (1991); *People v. Eckles,* 83 Ill.App.3d 292, 38 Ill.Dec. 934, 404 N.E.2d 358, 365 (1980); *State v. Wangberg,* 272 Minn. 204, 136 N.W.2d 853, 854–855 (1965). Such arguments have generally been found to be confusing, unnecessary and inflammatory. *Bennett,* 92 F.3d at 1346. Indeed, the Pennsylvania Supreme Court has decreed that reliance in any manner upon the Bible or any other religious writing in support of the imposition of the death penalty is reversible error *per se. Chambers,* 599 A.2d at 644. *See Also: Commonwealth v. Brown,* 551 Pa. 465, 492–493, 711 A.2d 444, 457 (1998). As the Third Circuit has yet to adopt this philosophy, however, we shall likewise review the prosecutor's biblical remarks here in the context of the whole. The challenged comments are as follows:

> "Sometimes words and adverbs slipping in, perhaps attempts to place in your mind some kind of feeling of, jeez, maybe I'll do something wrong; am I really that way, or I shouldn't do it because it will make me seem like I'm eager to punish or I'm out for retribu-

tion and I don't want it and another thing is if your Christian values say not to come back with the death penalty.

> Well, ladies and gentlemen, I in no way and in no case at all, inasmuch as I'm a Christian myself, suggest that there is not an important phase, an important consideration of Christian values. But what we are concerned with now and the testament and the Bible will tell you that there is law in the city and there's a law of God. There is a law of this land and there is a law that we must act through this land, a spiritual law and that being the law of God. But the law that we are concerned with now, the law that convicted both of these defendants is not Christian law, so to speak, but the law of the land which you have got to abide by and apply."

(N.T. 11/16/83, 123–124). The Commonwealth avers that this argument was only made in response to defense counsel's statement that "...if only one of you believes that the Christian thing to do, even under these brutal circumstances, is that this man should receive life, the verdict will stand but the sentence will be life." Considering the prosecutor's argument in the context of the whole and in view of Mr. Kindler's counsel's remarks, we do not find error of constitutional proportions. Instead, it appears that Mr. McGill's statement was indeed tailored to counter that of Mr. Alva and operated to remind the jury that the law which they were being charged with applying was not canon law. We therefore deny the petition for writ of habeas corpus on the basis of these remarks.

7. *Failure of the Jury to Give Effect to Petitioner's Evidence of Mitigation.*

 Next, Mr. Kindler submits that his sentence must be vacated because the jury ignored the clear, uncontroverted mit-

igating evidence that he had no prior criminal convictions and failed to find that *any* mitigating circumstances at all existed in his case. We disagree.

It is well-settled that if a state has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991), quoting *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984). This is essentially the purpose behind the consideration of aggravating and mitigating circumstances—to sort out those deserving of the death penalty from those who are not and to prevent the arbitrary and irrational imposition thereof. Thus, to pass constitutional muster under the Eighth and Fourteenth Amendments, the sentencer can not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982), quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Petitioner asserts that this case is controlled by *Parker v. Dugger*, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). In that case, the defendant Parker was convicted of two first degree murders and one third degree murder in Florida state court. At the advisory sentencing hearing, Parker presented evidence in mitigation of a sentence of death and argued that such evidence had also been presented at trial. The jury found that sufficient aggravating circumstances existed to justify a death sentence but that sufficient mitigating circumstances outweighed the aggravators and it therefore recommended a life sentence on both of the first degree murders. The trial judge, who has ultimate sentencing authority under Florida law, accepted the jury's recommendation for the one murder, but sentenced defendant to death on the other, explaining that he had "carefully studied and considered all the evidence at trial and at advisory sentencing proceedings," but found "there are no mitigating circumstances that outweigh the aggravating circumstances." *Parker*, 111 S.Ct. at 734. On direct appeal, the Florida Supreme Court apparently considered and struck two of the aggravating factors but did not make its own independent determination whether the evidence supported a finding of nonstatutory mitigating circumstances. On habeas review, the U.S. Supreme Court noted that in a weighing state, when a reviewing court strikes one or more of the aggravating factors on which the sentencer relies, it may either re-weigh the remaining evidence or conduct a harmless error analysis. Thus, reasoned the Court, the Florida Supreme Court's failure to conduct an independent re-weighing of the evidence was error. While the *Parker* case stands for an important legal proposition, it clearly is factually inapposite to the case at bar and we do not read it to require a *sentencing jury* to specifically articulate the bases for its findings. Accordingly, we do not find it dispositive here and given that there is no evidence on this record that the jury did not consider the mitigating evidence presented to it, we cannot find any error of constitutional dimension.

Moreover, as the Commonwealth points out, in this case the mitigating evidence presented by petitioner came in the form of testimony from several family friends and co-workers that he is a good, hardworking and kind person who could still do

some good for society even from behind bars particularly in view of his unique skills and talents with electronics. He did not present any evidence that he had no significant criminal history, but rather that was a point which his attorney argued to the jury in his closing argument. (N.T. 11/16/83, 59–78, 104–105). Given that the jury was also properly instructed that Petitioner had the burden of proving mitigating circumstances by a preponderance of the evidence and the arguments of counsel are not evidence, we cannot find any error in the jury's finding. (N.T. 11/16/83, 152). For all of these reasons, the application for writ on the basis of this argument is denied.

### 8. Trial Court's Failure to Provide a Life Without Parole Instruction.

 Petitioner also asserts that his rights under the Sixth, Eighth and Fourteenth Amendments were violated by virtue of the trial court's failure to include a jury instruction that under Pennsylvania law, life imprisonment means life without the possibility of parole.

The law is clear that where the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole such that the only sentencing alternative available is life imprisonment without the possibility of parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible. *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 728, 151 L.Ed.2d 670 (2002); *Simmons v. South Carolina*, 512 U.S. 154, 156, 114 S.Ct. 2187, 2190, 129 L.Ed.2d 133 (1994).[19]

In this case, however, it does not appear that the issue of whether the petitioner had the potential to be dangerous in the future was ever raised. (*See, e.g.*, N.T. 11/16/83, 119–145). We therefore do not find any violation of Petitioner's constitutional rights as the result of the trial court's failure to give the jury a "life without parole" instruction.[20] Accordingly, the application for writ of habeas corpus on this ground is denied.

### 9. Trial Court's Defective Preponderance of the Evidence Instruction and the Cumulative Effect of the Errors in this Case.

Petitioner next avers that the instructions given to the jury at the opening of

---

**19.** The Commonwealth has argued that these principles should not be applied in petitioner's case as his conviction became final before *Simmons* was decided. While it is true that the Supreme Court has found this rule to be a "new" rule not subject to retroactive application under *Teague v. Lane, supra,* it has also held that convictions become final upon its denial of certiorari. *O'Dell v. Netherland,* 521 U.S. 151, 157, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351, 358 (1997) ("Petitioner's conviction became final on October 3, 1988 when we declined to review the Virginia Supreme Court's decision affirming his sentence on direct review.") We therefore find that Petitioner's conviction became final on October 11, 1994 when the U.S. Supreme Court denied his petition for certiorari, some four months after the Court rendered its decision in *Simmons*.

**20.** In so holding, we also reject Mr. Kindler's alternative arguments that because the trial court did not give the "life without parole" instruction, his death sentence was imposed on the basis of inaccurate information and was arbitrary and capricious. Indeed, as the Commonwealth points out, a sentence of life imprisonment in Pennsylvania is subject to possible commutation by the Board of Pardons and the Governor. *See, e.g., Scarbrough v. Johnson,* 300 F.3d 302, 307 (3d Cir.2002); *Carpenter v. Vaughn,* 296 F.3d 138, 156 (3d Cir.2002). We thus cannot find that the death sentence was based on inaccurate information. In all other respects, the petition for habeas relief is moot given our findings that Petitioner is entitled to a new sentencing hearing based on *Mills*.

the penalty phase of his trial on preponderance of the evidence were incorrect and that this constituted a violation of his rights under the Sixth, Eighth and Fourteenth Amendments. Finally, Petitioner contends that he is entitled to habeas relief based upon the cumulative prejudicial effect of all of the trial errors in this case.

Specifically, the instructions to which Petitioner here takes exception were as follows:

Mitigating circumstances must be proved by the defendant by a preponderance of the evidence. A preponderance of the evidence is somewhat less proof than is required for a reasonable doubt. (N.T. 11/16/83, 30).

Given our previous finding that the overall jury instructions as to the burden of proof attendant to mitigating circumstances given in this case were violative of *Mills v. Maryland*, we see no reason to address this argument again. Likewise, inasmuch we have found no constitutional error entitling Petitioner to a new trial but have found several such errors entitling him to be re-sentenced, we also decline to address his "cumulative effect" argument.

### Conclusion

As discussed above, we have found prosecutorial misconduct at the penalty phase of Petitioner's trial and that the jury instructions and verdict sheet employed to sentence him did not comply with *Mills v. Maryland*. We have found no merit to the remainder of Petitioner's claims. For these reasons, the petition for writ of habeas corpus is granted only as to the sentencing portion of Petitioner's trial. The Commonwealth of Pennsylvania may conduct a new sentencing hearing within 180 days of the date of this Memorandum and Order, during which period the execution of the writ of habeas corpus shall be stayed, or shall sentence Petitioner to life imprisonment.

An order follows.

### ORDER

AND NOW, this day of September, 2003, upon consideration of the Petition of Joseph Kindler for Writ of Habeas Corpus and the Respondents' Briefs in Reply thereto, it is hereby ORDERED that the Petition is GRANTED on the following grounds:

1. that the instructions given to the jury in the sentencing portion of the trial were in violation of the rule decreed in *Mills v. Maryland, supra;*

2. that the prosecutor improperly introduced and argued improper aggravating factors against the defendant and improperly vouched for the death penalty only with respect to Petitioner during the sentencing portion of the trial in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

IT IS FURTHER ORDERED THAT the execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this Memorandum Opinion. If, after 180 days, the Commonwealth of Pennsylvania shall not have conducted a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence Petitioner to life imprisonment.

No certificate of appealability shall issue. *See Generally:* 28 U.S.C. § 2253.